**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

*********************************
**In re:**
**Kevin J. Mattson**
**Debtor**
********************************

**Chapter 7**
**Case No. 24-20188-PGC**

**Adv. P. No. 26-__________**

**Edmond J. Ford, Trustee,**

**v.**

**Severin M. Beliveau, Cynthia Beliveau**
**Alexander Nevens & Rachel Nevens**

********************************

## COMPLAINT

### PARTIES

1. Plaintiff (the "Trustee") is an individual with a business address at 815 Elm Street, Suite 5 B, Manchester, NH 03101.

2. The Defendant, Severin M. Beliveau, ("Beliveau") is an individual with a former address at 135 Sheridan Street, Unit 405, Portland, ME 04101 and a mailing address in this proceeding at c/o Randy J. Creswell, Esq., PO Box 7340, Portland, ME 04112.

3. The Defendant, Cynthia M. Beliveau, ("Ms. Beliveau") is an individual with a former address at 135 Sheridan Street, Unit 405, Portland, ME 04101 and a mailing address in this proceeding at c/o Randy J. Creswell, Esq., PO Box 7340, Portland, ME 04112.

4. Beliveau and Ms. Beliveau are husband and wife and hereinafter referred to as the Beliveaus.

5. The Defendant, Alexander Nevens is an individual with a mailing address at P.O. Box 136 Newcastle Maine, 04553.

6. The Defendant Rachel Nevens is an individual with a mailing address at P.O. Box 136 Newcastle Maine, 04553.

7. Rachel and Alexander Nevens are husband and wife and hereinafter referred to as "Nevens".

**JURISDICTION AND VENUE**

8. This bankruptcy proceeding was commenced by involuntary petition filed September 12, 2024.

9. The order for relief in this matter entered on October 10, 2024. [D.E. 10]

10. Plaintiff was appointed the Chapter 7 trustee in this matter by order entered February 14, 2025. [D.E. 88].

11. The District Court for the State of Maine has jurisdiction over this proceeding because it involves matters which arise under Title 11 or arise in or relate to a case under Title 11. 28 U.S.C. §1334(b).

12. Venue is appropriate in the State of Maine because this proceeding arises in or relates to a case under Title 11 which is pending in this District. 28 U.S.C. §1409(a).

13. The District Court for the District of Maine has referred this proceeding to this Bankruptcy Court by LR 16.8(a).

14. This proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(B), (F), (K) & (O) involving the allowance or disallowance of claims against the estate, the avoidance of a preference, the avoidance of lien claims, the determination of the validity, extent and priority of certain liens and is otherwise a proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor. As a core proceeding this Bankruptcy Court is empowered to enter final orders and rulings. 28 U.S.C. §157(b)(1).

15. Trustee consents to the entry of final judgments or orders by this Court.

**INTRODUCTION**

16. Kevin Mattson, the Debtor, was born in 1968.

17. Beliveau is approximately thirty years older and was born in 1938.

18. Mattson met Severin Beliveau in 1986 (when he was 17) when Mattson's father supported Beliveau's run for governor. Beliveau was defeated in the Democratic primary.

19. In 1993, when he was 24 years old, Mattson worked for Democrat Joseph Brennan's campaign for reelection as governor of the State of Maine. Brennan was defeated by Angus King.[1] At the time, Beliveau, now in his mid-fifties, was an influential democratic lobbyist and fundraiser who worked closely with the Brennan campaign.

20. Mattson continued in politics working as the executive director of the State Democratic party and the chief of staff for the Maine House Democrats. At the time Beliveau was very involved in the activities of the Democratic party and as a result he and Mattson worked frequently together.

21. In 1998, Mattson proposed to Beliveau that they enter into the business of real estate development. The plan was to acquire properties to lease to the State of Maine. The proposal was that they would partner in real estate development where Mattson would provide the day-to-day grunt work, Beliveau would provide credit and a lobbyist's access to the state. They would jointly make the business decisions of the venture.

22. Years later, Beliveau related the story to Mainebiz after Mattson (in the words of the story) "pitched him [Beliveau] on the plan for the company." "To Beliveau it wasn't a difficult decision." Beliveau told the journalist "Our difference was that we were willing to plan

[1] Susan Collins came in third. https://en.wikipedia.org/wiki/Joseph_E._Brennan

long term, and structure our investments that way. A lot of developers need to get a cash return quickly. That's not our focus."[2]

23. Their partnership used the name "Harpers Development."[3]

24. Mattson and Beliveau were close personal friends. So close that Beliveau officiated at Mattson's wedding in 2000.

25. One of their first purchases was a property in Hallowell, Maine through an entity named EDCL LLC, an entity named for Beliveau's four sons.

26. In addition to Mattson, "Harpers Development" came to be known to include three individuals perceived to be politically connected and powerful: Chris Harte, John Orestis and Severin Beliveau.[4]

27. Outside of specific projects, Harte and Orestis did not play material roles in the management of "Harpers Development" but were, instead, investors.

28. Mattson and Beliveau shared in the profits of their partnership business sometimes between themselves, or where appropriate, with Harte and Orestis.

29. They became the largest landlord to the State of Maine. It was reported in 2006 that they obtained "close to half of state contracts for office space in the Augusta area for the past few years."[5]

---

[2] https://mainebiz.biz/article/second-act-kevin-mattson-makes-harpers-development-a-statewide-power/
[3] https://mainebiz.biz/article/second-act-kevin-mattson-makes-harpers-development-a-statewide-power/

[4] *See, e.g.,* The Portland Phoenix, April 16, 2006 "The Insiders" https://web.archive.org/web/20060316041941/http:/portlandphoenix.com/features/top/ts_multi/documents/04653148.asp ; The Portland Phoenix, March 20, 2006, "Augusta's Mayor, his two hats and $400,000." https://web.archive.org/web/20060320230959/http:/www.portlandphoenix.com/features/other_stories/multi1/documents/04627467.asp
[5] The Portland Phoenix, March 20, 2006, "Augusta's Mayor, his two hats and $400,000." https://web.archive.org/web/20060320230959/http:/www.portlandphoenix.com/features/other_stories/multi1/documents/04627467.asp

30. The management of "Harpers Development" was undertaken by Mattson and Beliveau. They were the "partners."

31. Beliveau and Mattson were variously reported in the Press as the "partners" of Harpers Development doing substantial development of commercial properties typically leased to State agencies.

32. Downeast Magazine reported in an article titled "15 Maine Companies to Watch", in its January 2007 issue[6]:

> Along the way, the firm [Harpers Development] has come under fire for what some observers see as preferential treatment from state agencies given that its CEO, Kevin Mattson, is a former head of the Maine Democratic Party and that his business partner, Severin Beliveau, is both a partner in one of the state's largest law firms and perhaps Maine's most prominent lobbyist. But whether its activities are the result of political cronyism or simply good business sense, Harper's influence on the state's industrial landscape is undeniable.

33. Until the real estate crash in 2008, they developed a portfolio containing real estate with a gross asset value in excess of $100,000,000.00.

34. In an article in Mainebiz on May 3, 2010, Mattson described to the reporter some of the effects of the crash on Harpers Development (which he described as renamed as Mattson Development)– "We went from being a development company to a management company, just like that."

35. The reporter also interviewed Beliveau, describing him as Mattson's "financial partner[7]":

> Severin Beliveau, senior partner in law firm Preti Flaherty and one of the state's best-known lawyer-lobbyists, has been a financial partner with Mattson for more than 10 years. "A lot of people would have given up,"

---

[6] P. 24H

[7] Mainebiz, May 3, 2010, "Build up | Kevin Mattson's back to dreaming up development deals after a crashing market deals a blow"

> Beliveau says. "Kevin was engaged in intense negotiations with banks, investors, creditors, tenants every day for a year. He was tenacious."

36. Mattson and Beliveau were co-owners in each of those properties and co-owners of the real estate development venture colloquially referred to as "Harpers" later "Mattson Development" and within Beliveau's law firm, Preti Flaherty, "Kevrin".

37. Mattson and Beliveau co-owned that real estate development venture for the purpose of making money.

38. From and after 1999, Mattson engaged only in real estate projects or investments for profit after first consulting with Beliveau to ask if he wanted to be a partner.

39. On information and belief, from and after approximately 1999, Beliveau did not invest in any substantial real estate projects or investments for profit without Mattson as a partner.

40. In the good times, each of Mattson and Beliveau shared in the profits of the real estate development venture.

41. The development venture was known variously as Kevrin, Harpers, Harpers Development, or Mattson Development.

42. In the bad times, each of Mattson and Beliveau shared in the losses of the real estate development venture known variously as Kevrin, Harpers, Harpers Development, or Mattson Development.

43. The real estate development venture, known variously as Kevrin, Harpers, Harpers Development, or Mattson Development did business through dozens to over a hundred entities.

44. As Severin Beliveau described it ". . . Kevin is my business partner . . . our primary investments are in land and commercial buildings and we are always looking at other

investment opportunities that would produce a reasonable return for my partners. Could you provide me with specific examples of investment opportunities . . . Our companies have very good credit and strong financial statements . . ." *Email C Beliveau on behalf of S. Beliveau to Amado Fall*, 11/27/2004 8:29 p.m.[8] In other words, they were partners in the real estate development business developing real estate acting through various companies.

45. Geoffrey Houghton understood Mattson and Beliveau to be partners in real estate development.

46. As Geoffrey Houghton has described to the Trustee, Beliveau and Mattson were known to business people in the Augusta community as partners in real estate development.

47. In 2008 the crash hit the venture hard.

48. Throughout the period from 1998 through approximately 2015, Beliveau's firm Preti, Flaherty, Beliveau and Pachios ("Preti") did the legal for the two of them and all their entities. The firm received hundreds of thousands of dollars of fees on average annually, totaling millions in total fees paid over the years.

49. Mattson did so much work with Beliveau and Preti spending so much time there, that after 2010, he has told more than one person that he essentially had an office at Preti and spent the majority of the working day in one of the several Preti offices

50. By 2015, the close business partnership between Beliveau and Mattson had its own name in Preti – "Kevrin."

51. "Kevrin" accurately described the close working partnership between Beliveau and Mattson.

---

[8] jk8da58BcmcvLNeRWUU4

52. In 2015, Preti attorneys were the registered agents for thirty-nine (39) "Kevrin" entities.

53. Kevrin, Harpers Development, Harpers or Mattson Development were all colloquial terms used in various contexts to identify the partnership between Kevin Mattson and Severin Beliveau in the development of commercial real estate.

54. Beliveau was the older, better known and more politically powerful partner. He had the power to control what the partnership did and every aspect of how it was structured.

55. In the words used frequently in emails from Mattson to Beliveau and others, Beliveau was "Le Grande Fromage." *Email, Mattson to Beliveau and Claire,* 05/02/2013 04:16:21 PM; *Mattson to Beliveau, Male and Libby*, 02/06/2015 03:40:23 PM; *Mattson to Federle, Beliveau and Robinson,* 06/27/2007 12:38:59 PM; *Mattson to Beliveau, Day, Thibodeau, C. Beliveau, and S. Beliveau,* Tuesday, August 15, 2017 4:16:40 PM,

56. In Beliveau's words when negotiating his exit, he wanted to "get out of the business;" he wished not to be "constantly bothered by the daily brush fires that have unfortunately become routine in our shared real estate endeavors;" and he hoped to maximize the success of "our portfolio." *Email S. Beliveau to K. Mattson,* July 10, 2017 2:20 p.m.[9]

57. The individual LLC entities functioned as the portfolio in a collective singular partnership business.

58. Mattson and Beliveau communicated daily over a period of more than ten years about the details of the management of their development business. Such communications included thousands of emails about all manner of issues relating to their development of commercial real estate.

[9] iD0oZZ8BdflnMr8s-eC7

59. Even with equity investment from others, Mattson and Beliveau, each personally guaranteed the debt of the various entities developed by the "Kevrin", "Harpers Development", "Harpers" or "Mattson Development" partnership and thereby shared in the losses of the real estate development venture if realized.

60. In or about 2015, Preti required Mattson and Beliveau to move their legal business elsewhere.

61. As of September 28, 2016, Debtor and Beliveau jointly owned approximately sixteen projects with a claimed gross value at the time of $76,950,646.00 subject to mortgages, debts, and outside investor's interests.

62. The various projects were treated as a unified whole with cash from one project being used to support other projects.

63. The valuations placed on the projects were, on information and belief, inflated. For example, the value placed on Central Maine Commerce Center, LP as of 2016 was $27,000,000.00. That property was sold seven years later in 2023 for approximately $18,500,000.00 – 68%.

64. Beginning in approximately 2016 and continuing into 2017 Mattson and Beliveau negotiated the terms of a modification of their partnership arrangement to remove Beliveau's responsibility for personal guarantees of the partnership's debt.

65. The negotiations ultimately resulted in the execution of a document referred to as the "Exit Agreement."

66. At the time, the partnership was insolvent – the partnership assets were worth less than the partnership liabilities.

67. At the time, the partnership had been unable to pay its debts as they came due, having struggled with being "undercapitalized for proper and efficient operations." *Email of K. Mattson to S. Beliveau,* November 20, 2014, 12:18:13 p.m.[10]

68. The purpose of the Exit Agreement was to save Beliveau from loss from the partnership's insolvency. The Exit Agreement recited "in furtherance of Severin's exit from the Projects, Severin and Kevin wish to minimize Severin's liabilities on the Guaranteed Loans and Assumed Loans . . ." *Exit Agreement*, p. 1.

69. The Exit Agreement did not mention payment of partnership creditors except in connection with protecting Beliveau from the obligation to do so.

70. The Exit Agreement did not mention payment of Mattson's creditors.

71. At and before the execution of the Exit Agreement, Mattson and Beliveau knew that there was no realistic plan or ability to pay all creditors of the partnership, particularly the "Tranche B" creditors. The Exit Agreement was based on the hope that Mattson could successfully finish high risk developments. As Mattson wrote to Beliveau "the probability of the resolution of the outstanding global debt, through development, is based as much on effort, hope and perseverance than fundamentals."[11] *Email Mattson to S. Beliveau and C. Beliveau,* 7/28/2017 3:18:24.

72. By March 2018, it was clear to Mattson and made clear to Beliveau that they could not pay all the creditors of their venture. *Email Mattson to S. Beliveau, C. Believeau and Thibideau,* 3/31/2018, 7:44:21 a.m. ("At a meeting several months ago with Conor and Severin, it was agreed that at the meeting with the Gurleys we would have a very honest discussion about our ability to pay these notes back (we cant)."); *Email C. Beliveau to K Mattson and S.*

---

[10] 4T8da58BdflnMr8sWLhg
[11] bUagUp8BcmcvLNeRA0Ht.

*Beliveau,*1/25/2018 9:05:33 a.m. (acknowledging "there is no money available to repay [Gurley's] debt").[12]

73. By the Fall of 2018, it was apparent that the partnership did not have enough cash to meet its obligations and that had been true from the Exit Agreement's execution. *Email Mattson to Thibideau and Beliveau,* 11/2/18 3:11:29 pm[13]. ("my refrain from the beginning of the exit process we started last year has been a statement that we do not have enough identifiable cash either in the companies or personally to reach the goals of the exit agreement. And I believe this remains the case today.")

74. After execution of the Exit Agreement, the partnership never became solvent.

75. After the execution of the Exit Agreement Mattson never became solvent.

76. The Exit Agreement modified the terms of the partnership to provide a route for the winding up of the affairs of the partnership.

77. The partnership business has not yet, today, been wound up.

78. The partnership continues to exist. Me. Rev. Stat. tit. 31, § 1082.

79. The Exit Agreement is a written acknowledgment by Mattson and Beliveau that they are co-owners of a business for profit: "Severin and Kevin are involved in various real estate projects in Maine through their ownership interests in multiple entities which are more particularly described in Exhibit A (the 'Projects')". *Exit Agreement*, p. 1.

80. The Exit Agreement acknowledges Beliveau's capital contributions to the partnership. *Exit Agreement,* p. 1. Art. I, §1.

81. The Exit Agreement obligated Beliveau to make further "Capital Contributions" to the partnership. *Exit Agreement*, p. 2, §§2 & 3.

[12] gkagUp8BcmcvLNeRAzwX
[13] OT0oZZ8BdflnMr8s-d-7

82. The Exit Agreement acknowledged Mattson's capital contributions to the partnership. *Exit Agreement*, p. 2 Art. II.

83. The use of the term capital contributions acknowledges ownership of a business.

84. The Exit Agreement acknowledged the existence of an "obligation to 'True Up' on their respective financial contributions to the Projects. . ." *Exit Agreement*, p. 5 Art. VI.

85. The obligation to true up is the recognition of a partnership allocation of responsibilities.

86. The Exit Agreement divided partnership properties but retained joint control. *Exit Agreement,* p. 5-6, Art. VII §§1 b, c, d, e.

87. The Exit Agreement treated all cash flow from all projects as a whole named "Global Cash Flow."

88. The Exit Agreement dedicated Global Cash Flow to Beliveau's expenses. *Exit Agreement*, Art. XV.

89. Beliveau and Mattson, in the Exit Agreement and elsewhere, treated the partnership assets as a single business.

90. In their single business, funding from one project was used for other projects owned by the partners. Equity in existing projects was used to support debt to fund the purchase of new projects.

91. The partnership continues to exist until the partnership assets are disposed of and partnership creditors paid.

92. Partnership creditors have not been paid and have filed claims in this bankruptcy case.

93. Partnership assets have not been completely disposed of.

## COUNT I – DECLARATION PARTNERSHIP

94. Each of the foregoing allegations are hereby realleged and incorporated.

95. From sometime around 1998 through today and otherwise at least through October 31, 2023, the Debtor and Beliveau associated together as co-owners for profit of a business developing, investing in, managing, financing, syndicating and selling real estate. (The “Business”)

96. The Business operated through numerous entities with respect to multiple properties.

97. The Debtor and Beliveau shared in the profits of the Business.

98. The Debtor and Beliveau shared in the expenses and losses of the Business.

99. The Debtor and Beliveau operated the Business with the intent of earning a profit.

100. The Debtor and Beliveau formed a partnership. Me. Rev. Stat. tit. 31, § 1022.

WHEREFORE Plaintiff respectfully requests that this Honorable Court order, decree and declare:

A. That the Debtor and Beliveau were partners under Me. Rev. Stat. tit. 31, § 1022;

B. That the Business in which they were engaged was a partnership; and

C. For such other and further relief as may be just.

## COUNT II – FIDUCIARY DUTY AND ACCOUNTING
## Me. Rev. Stat. tit. 31, § 1044

101. Each of the foregoing allegations are hereby realleged and incorporated.

102. As of the date of the execution of the Exit Agreement, the partnership property included debt investments, equity interests, or other rights nominally held in the names of Mattson and Beliveau in, to or against the following entities or projects (the “Investments”):

**a.** Harpers II, LLC,

**b.** Central Maine Commerce Center, LLP,

**c.** Commerce Center Management, LLC,

**d.** Central Maine Commerce Center, Inc.,

**e.** Mattson Development, LLC,

**f.** Harpers Development, LLC,

**g.** Augusta East Redevelopment Company, LLC,

**h.** Hallowell House, LLC,

**i.** Maine Café, LLC,

**j.** New England Capital Holdings, LLC,

**k.** Saco Island, LP

**l.** Saco Island East, LLC,

**m.** Saco Island West, LLC,

**n.** SI Development, LLC,

**o.** Newcastle Ventures, LLC,

**p.** Newcastle Public House, LLC

**q.** Seton Holdings, LLC,

**r.** Waterville Redevelopment Company I, LLC,

**s.** Waterville Redevelopment Company III, LLC,

**t.** Waterville Redevelopment Company IV, LLC,

u. EDCL, LLC,

v. Harpers West, LLC, and

w. Lot 1, LLC.

103. On information and belief, many of the Investments were acquired with money borrowed by the partners acting jointly secured by membership interests in other partnership projects. The partnership funded the purchase of the Investments by undertaking joint debt secured by the equity in other partnership assets.

104. The partnership being in the business of investing in the Investments, each of the Investments were partnership property at the date of dissolution of the partnership.

105. By the Exit Agreement, and the documents executed pursuant to the Exit Agreement Mattson purported to transfer to Beliveau (either absolutely or as security) Mattson's interest (whether debt, equity or otherwise) in:

**a.** Harpers II, LLC,

**b.** Central Maine Commerce Center, LLP,

**c.** Commerce Center Management, LLC,

**d.** Hallowell House, LLC,

**e.** Newcastle Ventures, LLC,

**f.** Newcastle Public House, LLC

g. EDCL, LLC,

h. Harpers West, LLC, and

i. Lot 1, LLC.

j. (Collectively the "Mattson Investment Transfers")

106. Because the Investments were property of the partnership and not of Mattson, the Mattson Investment Transfers were ineffective to transfer any ownership interest in any Investments in the entities listed in the foregoing paragraph. Me. Rev. Stat. tit. 31, § 1051.

107. Beliveau held the Investments listed in the foregoing paragraph as partner in his partnership with Mattson.

108. Beliveau held the Investments listed in the foregoing paragraph subject to the obligation to apply the same to the "discharge of the partnership's obligations to creditors." Me. Rev. Stat. tit. 31, § 1087 (1).

109. Beliveau owed duties to the partnership and his partner, Mattson, of loyalty and care. Me. Rev. Stat. tit. 31, § 1044 (1).

110. Beliveau's duty of loyalty includes an obligation to account to Mattson and this bankruptcy estate for the proceeds of the partnership property held by him. Me. Rev. Stat. tit. 31, § 1044 (2) (A).

111. Beliveau has not accounted to Mattson or this bankruptcy estate for the proceeds of the partnership property held by him.

112. The Bankruptcy Estate is entitled to an accounting of the partnership property held by Beliveau and its proceeds. Me. Rev. Stat. tit. 31, § 1044 (2) (A)

113. In dealing with partnership assets Beliveau owed Mattson a duty of good faith and fair dealing. Me. Rev. Stat. tit. 31, § 1044 (4).

114. Beliveau held the Investments described in the Mattson Investment Transfers subject to an obligation to liquidate them and pay creditors of the partnership in good faith and otherwise deal with his partner and creditors fairly. Me. Rev. Stat. tit. 31, § 1044 (4)

115. Beliveau breached his obligations to liquidate partnership assets described in the Mattson Investment Transfers and pay partnership creditors in good faith and instead, took proceeds of all such assets for himself without paying partnership creditors and without accounting to his partner.

116. **<u>Newcastle Project</u>:** In particular, and without limiting the foregoing, Beliveau purported to obtain a pledge of Mattson's Investment in Newcastle Ventures, LLC and Newcastle Public House, LLC.

117. Beliveau thereafter purported to conduct a secured party sale of the Mattson Investment in Newcastle Ventures, LLC and Newcastle Public House, LLC.

118. On information and belief, Beliveau sold the Mattson Investment Interest in Newcastle Ventures, LLC or Newcastle Public House, or both, to a client of his law firm.

119. On information and belief, the Newcastle Ventures or Newcastle Public House was thereafter sold for an amount that could have generated approximately $1,000,000.00 in excess of the secured debt on that project. (the "Newcastle Proceeds").

120. The Newcastle Proceeds were, in equity, property of the partnership.

121. The Newcastle Proceeds should have been paid to partnership creditors.

122. This Bankruptcy Estate is damaged by the diversion of $1,000,000 from payment of its creditors to or for the benefit of Beliveau in violation of his fiduciary duties under Me. Rev. Stat. tit. 31, § 1044 2 A.

123. This Bankruptcy Estate is damaged by the diversion of $1,000,000 from payment of its creditors to or for the benefit of Beliveau in violation of his duty of care under Me. Rev. Stat. tit. 31, § 1044 3.

124. This Bankruptcy Estate is damaged by the diversion of $1,000,000 from payment of its creditors to or for the benefit of Beliveau in violation of his duty of to Mattson of good fath and fair dealing under Me. Rev. Stat. tit. 31, § 1044 4.

125. **<u>Central Maine Commerce Center/ Harpers Development, LLC</u>**: The Exit Agreement and the Settlement Agreement purported to convey to Beliveau Mattson's

Investments in Central Maine Commerce Center, LP, and Commerce Center Management LLC, and Mattson and Beliveau have differing claims with respect to the intent in the Exit Agreement as to rights in or to Harpers Development, LLC. (the “CMCC Interests”)

126. Each were partnership assets.

127. The conveyance was ineffective and the CMCC Interests remained partnership property. Me. Rev. Stat. tit. 31, § 1051.

128. On information and belief, Beliveau has liquidated the CMCC Interests and received substantial cash therefore net of creditor claims (the “CMCC Proceeds”).

129. Beliveau has not accounted to the Bankruptcy Estate for the CMCC Proceeds.

130. The CMCC Proceeds should have been paid to partnership creditors.

131. This Bankruptcy Estate is damaged by the diversion of the CMCC Proceeds from payment of its creditors to Beliveau in violation of his fiduciary duties under Me. Rev. Stat. tit. 31, § 1044 2 A.

132. This Bankruptcy Estate is damaged by the diversion of the CMCC Proceeds from payment of its creditors to Beliveau in violation of his duty of care under Me. Rev. Stat. tit. 31, § 1044 3.

133. This Bankruptcy Estate is damaged by the diversion of the CMCC Proceeds from payment of its creditors to Beliveau in violation of his obligation of good faith and fair dealing under Me. Rev. Stat. tit. 31, § 1044 4.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court order and decree as follows:

A. That Beliveau be required to account for all partnership property that has come into his possession;

B. That judgment enter against Beliveau for an amount equal to the value of the partnership property diverted to him;

C. That judgment enter against Beliveau for an amount equal to the damage suffered by Mattson arising from the violation by Beliveau of his fiduciary duties, duty of care and obligations of good faith and fair dealing under Me. Rev. Stat. tit.31 §1044; and

D. For such other and further relief as may be just and equitable.

**COUNT III – PREFERENCE**
**SETTLEMENT TRANSFERS OCTOBER 31, 2023**
**11 USC 547**

134. Each of the foregoing allegations are hereby realleged and incorporated.

135. On or about the beginning of 2023, the Beliveaus sued Mattson. Severin Beliveau et. al. v. Kevin Mattson, et. al. Docket No. PORSC-CV-2023-057. (the "2023 Action").

136. The 2023 Action was an antecedent debt.

137. The Exit Agreement created obligations that were antecedent debts.

138. Beliveaus were creditors of the Debtor.

139. In the calendar year 2023, and by October 31, 2023, the Debtor had no more assets than he had at the time of the filing of the involuntary petition.

140. At the time of the filing of the involuntary petition, the fair value of the Debtor's assets net of secured debts was essentially zero.

141. In the calendar year 2023, and by October 31, 2023, the Debtor had essentially the same debts as he had at the time of the filing of the involuntary petition.

142. The Settlement Agreement dated October 31, 2023, added to the Debtor's debts and reduced his assets.

143. The Debtor was insolvent at the time of the involuntary bankruptcy petition.

144. The Debtor was insolvent on the date of the October 31, 2023 Settlement Agreement.

145. Debtor was insolvent throughout calendar year 2023.

146. The 2023 Action was resolved by the Settlement Agreement date October 31, 2023.

147. The Settlement Agreement included these obligations:

**a.** Mutual releases between the Beliveaus and Mattson and others;

**b.** A promise by the Debtor to pay $920,000.00 to the Beliveaus.

**c.** A confirmatory transfer by the Debtor of rights in certain companies that he had already been purportedly transferred to Beliveau;

**d.** A confirmatory transfer by Beliveau to the Debtor of rights in certain companies that he had already transferred to the Debtor and had no value; and

**e.** A transfer by the Debtor of rights in Commerce Center Management, LLC, ("CCM, LLC") which transfer had either not been previously made or perfected and which transfer had substantial value.

**f.** No portion of the Settlement Agreement transferred "new value" in money or money's worth in goods, services or new credit to the Debtor.

148. The Mutual releases were made within one year of the filing of the bankruptcy petition in this matter (September 12, 2024).

149. The release granted by the Debtor to Beliveau was a transfer of property of the debtor. Zeman v. Humphreys (In re Zeman), No. 09-52559, 2011 Bankr. LEXIS 3791, at *5 (Bankr. W.D. Tex. Mar. 15, 2011) ("Executing a release of potential claims of the bankruptcy estate constitutes a transfer of property of the estate.").

150. The release granted by Beliveau to the Debtor was not new value because it was not "money or money's worth in goods, services, or new credit." 11 U.S.C.S. § 547 (a)(2)

151. The transfer of the interest of the Debtor in CCM, LLC, was made and perfected within one year of the filing of the bankruptcy petition in this matter (September 12, 2024).

152. Beliveau gave no new value to the Debtor in the Settlement Agreement.

153. The Trustee has reasonably diligently (under the circumstances) examined reasonably discoverable facts relating to affirmative defenses and finds there are none. In particular, and without limiting the foregoing, the Settlement Agreement was not an ordinary course transaction being the settlement of unique litigation; the Settlement Agreement involved no transfer of new value to the Debtor; the Settlement Agreement was not a substantially contemporaneous exchange of new value; the Settlement Agreement was not a purchase money security interest, nor a floating lien, nor a payment of a domestic support obligation, nor the fixing of any statutory lien. The Settlement Agreement transferred more than $8,575.00.

154. Beliveau was an insider with respect to the Debtor.

155. Beliveau was an insider with respect to the Debtor because he was a partner of the Debtor in the Business.

156. Beliveau was an insider with respect to the Debtor because he was an insider with respect to various affiliates of the Debtor, including, without limitation, Harpers Development, LLC, of which each of Beliveau and Debtor held a 25% equitable interest.

157. Beliveau was an insider with respect to the Debtor because he had a "sufficiently close relationship with Debtor that his conduct is subject to closer scrutiny than those dealing at arms-length with the debtor." S.Rep. No. 95-989, 95th Cong., 2d Sess., reprinted in 1978 U.S.C.C.A.N., 5810

158. Harpers Development, LLC, was an affiliate of the Mattson because the Mattson owned 25% of the equity interests in Harpers Development, LLC.

159. Beliveau owned 25% of Harpers Development, LLC and was therefore an insider of Harpers Development, LLC, because he was an affiliate of Harpers Development LLC.

160. Beliveau was an insider of Harpers Development, LLC as an officer or person in control of the Harpers Development, LLC.

161. As an insider of an affiliate of Mattson, Beliveau was an insider with respect to Mattson.

162. In the alternative to the allegations in Count II and, if this Court were to find that the Debtor's rights in CCM, LLC were not partnership property, Beliveau received the Debtor's rights in CCM, LLC which rights were of significant value.

163. The Harpers Receivable was listed on the 2017 financial statements of Commerce Center of Central Maine, LP as due in the principal amount of $322,020.00 with accrued interest of 213,396.00. Interest has continued to accrue.

164. In the alternative to the allegations in Count II and, if this Court were to find that the Debtor's rights in the Harpers Receivable were not partnership property, Beliveau effectively received by the Settlement Agreement control over the Debtor's rights in the Harpers Receivable which rights, on information and belief were worth more than $133,854.

165. Beliveau received more as a result of the Settlement Agreement than he would have if the agreement had not been made, and if the Debtor had then filed a bankruptcy petition under Chapter 7.

166. The value of the property transferred to Beliveau under the Settlement Agreement on account of the antecedent debt of the Exit Agreement and the 2023 Action in excess of $1,000,000.00 (the "Settlement Transfers") including without limitation:

**a.** Mattson's $920,000.00 promissory note (including the amounts claimed in Claim Number 30 filed in this case)

**b.** The release of recovery claims relating to claimed improper foreclosure of equity interests in entities related to the business and real estate of the Newcastle Public House;

**c.** The value of Newcastle Ventures, LLC and NPH, LLC;

**d.** The value of amounts owed to Harpers Development LLC;

167. The Trustee and the Bankruptcy Estate are entitled to a judgment avoiding the Settlement Transfers pursuant to 11 U.S.C. §547(b).

168. The Trustee and the Bankruptcy Estate are entitled to judgment against Beliveau for the value of the Settlement Transfers. 11 U.S.C. §550 (a)(1)

WHEREFORE, Plaintiff respectfully requests that this Court order and decree:

A. That the Settlement Transfers be avoided as a preference;

B. That Claim Number 30 be disallowed;

C. That judgment enter against the Beliveaus for the value of the avoided Settlement Transfers; and

D. For such other and further relief as may be just and equitable.

**COUNT IV**
**PARTNER LIABILITY FOR PARTNERSHIP DEBTS**
**Me. Rev. Stat. tit. 31, § 1087**

169. Each of the foregoing allegations are hereby realleged and incorporated.

170. In the winding up of the affairs of a partnership, partnership assets must be applied to the payment of partnership debts before payment to partners. MRSA 31 §1087 (1).

171. The Exit Agreement and the Settlement Agreement each had the effect of diverting partnership assets to Beliveau rather than unpaid partnership creditors.

172. The Exit Agreement and the Settlement Agreement each had the intent of diverting partnership assets to Beliveau rather than to the unpaid partnership creditors.

173. Beliveau has an obligation to contribute to the payment of the unpaid partnership debts.

174. Unpaid partnership debts are claims in this case including particularly and without limitation Claim Number 34 of Joanne Gurley, Claim Number 35 of Kennebec Valley Council of Government, Claim Number 31 of Community Concepts Finance Corp., and Claim Number 6 of Lawson Property Services, Inc.

175. Unpaid partnership debts are filed in this proceeding in excess of $3,000,000.00 - $3,142,379.54.

176. The Trustee is a "person appointed by a court to represent creditors . . . of a partner." MRSA 31 §1087 (6).

177. The Trustee is entitled to enforce the obligation of Beliveau to contribute to the payment of partnership creditors. MRSA 31 §1087 (6).

178. Beliveau is jointly and severally liable on the partnership debts. MRSA 31 §1034 (1).

179. The Trustee is entitled to enforce Beliveau's obligation to contribute to the partnership.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court order and decree as follows:

A. That judgment enter in favor of Trustee and against Beliveau in an amount equal to his contribution obligation; and

B. For such other and further relief as may be just.

**COUNT V**
**IN THE ALTERNATIVE TO COUNT II**
**CONSTRUCTIVE FRAUDULENT CONVEYANCE**
**11 U.S.C. §548**

180. Each of the foregoing allegations are hereby realleged and incorporated, provided however that this Count V is pled in the alternative to Count II.

181. The Settlement Agreement transferred Settlement Transfers to the Beliveaus from the Debtor.

182. The value of the Settlement Transfers was substantial.

183. In exchange for the Settlement Transfers Beliveau conveyed to the Debtor, releases, and rights with little net worth.

184. The Settlement Transfers were conveyed by the Debtor to Beliveau for less than reasonably equivalent value.

185. The Settlement Transfers were conveyed by the Debtor at a time that the Debtor was insolvent.

186. The Settlement Transfers were made on or within two years of the filing of the involuntary petition in this matter.

187. The Settlement Transfers are avoidable pursuant to 11 U.S.C. §548(a)(1)(B).

188. The Plaintiff is entitled to judgment against the Beliveaus in an amount equal to the value of the Settlement Transfers pursuant to 11 U.S.C. §550(a) (1)

WHEREFORE, Plaintiff respectfully requests that this Honorable Court order and decree as follows:

A. That the Settlement Transfers be avoided pursuant to 11 U.S.C. §548(a)(1)(B);

B. That Claim Number 30 be disallowed;

C. That judgment enter against Beliveau and in favor of Plaintiff in an amount equal to the value of the Settlement Transfers; and

D. For such other and further relief as may be just.

**COUNT VI**
**IN THE ALTERNATIVE TO COUNT II**
**11 U.S.C. §544**
**<u>EXIT AGREEMENT</u>**

189. Each of the foregoing allegations are hereby realleged and incorporated except that this Count VI is pled in the alternative to Count II.

190. <u>*Triggering or "Golden" Creditor - Joanna Gurley*</u>: Joanna M. Gurley ("Gurley") is the holder of unsecured Claim Number 34 in the amount of $2,470,009.49. (the "Gurley Claim").

191. The Gurley Claim relates to a debt arising from Mattson's guarantee of two promissory notes to her deceased husband, each in the amount of $500,000.00, the first dated July 12, 2010, and the second dated January 13, 2012.

192. Gurley could not reasonably have discovered the transfers described or implemented by the Exit Agreement until after the filing of the petition in this bankruptcy case. Gurley could not have discovered those transfers *inter alia* because while she was in reasonably constant communication with Beliveau and Mattson regarding the amounts due, neither Beliveau nor Mattson disclosed to her the transfers described in the Exit Agreement.

193. Beliveau insisted that the Exit Agreement include a provision requiring the parties to keep it hidden. *See,* Exit Agreement, Art. XXII, ¶13 "Confidentiality" (". . . each party shall not disclose the terms of this Agreement to any third party except as reasonably necessary to perform his obligations under this Agreement, and in that case only on a need to know basis.")

194. Beliveau undertook steps to hide from Gurley (and other creditors) the Exit Agreement and its transfers.

195. Gurley has standing to recover under the Uniform Fraudulent Transfer Act, Me. Rev. Stat. tit. 14, § 3571 *Et. Seq.* with respect to the transfers effected or contemplated by and obligations created by the Exit Agreement under Me. Rev. Stat. tit. 14, § 3575 (actual fraud) and her claim for relief was not extinguished as of the date of the filing of the petition in this case. Me. Rev. Stat. tit. 14, § 3580 (1).

196. *Triggering or "Golden" Creditor – Department of the Treasury - Internal Revenue Service.* The Internal Revenue Service filed its proof of claim number 9-3 as an unsecured priority claim in the amount of $103,371.80 and a general unsecured claim in the amount of $3,223.72. (the "IRS Claim")

197. The IRS Claim was assessed against the debtor in part on November 23, 2020. The amount assessed on that date was $22,985.22.

198. The IRS, having assessed the tax before the petition date may act as a triggering creditor allowing the Trustee to recover under the Uniform Fraudulent Transfer Act for as much as (and perhaps more than) ten years before the date of the petition. Kittery Point Partners, LLC v. Bayview Loan Servicing LLC (In re Kittery Point Partners, LLC), Nos. Chapter 11, 17-20316, 17-2065, 2018 Bankr. LEXIS 859 (Bankr. D. Me. Mar. 12, 2018) (disallowing IRS as triggering creditor where the IRS had not assessed pre-petition).

199. *Triggering or "Golden" Creditor – SBA*: The SBA filed its unsecured proof of claim number 8 in the amount of $518,697.55. (the "SBA Claim").

200. The statute of repose of the Uniform Fraudulent Transfer Act is not effective against the Federal Government. Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.), 641 B.R. 467, 545 (Bankr. D. Del. 2022) ("As a result, 'when seeking to avoid fraudulent transfers via application of state law, [the federal government] is not subject to the state's extinguishment period.' Accordingly, if the Trustee stands in the shoes of the EPA, it is not subject to any state's statute of repose, including the DUFTA.")

201. The Trustee may step into the shoes of any of Gurley, the IRS or the SBA and assert fraudulent transfer claims arising in connection with the Exit Agreement.

202. *Claims under 14 M.R.S. §3575 1. (B)*: The Exit Agreement was an agreement in which Mattson incurred obligations to or for the benefit of Beliveau without receiving reasonably equivalent value. The obligations incurred included, without limitation, the promise by Mattson to indemnify Beliveau against the Loans Listed in Exhibits B and C of the Exit Agreement. *Exit Agreement*, Art. V.

203. The obligations Mattson undertook without receiving reasonably equivalent value therefore amounted to at least the so-called Tranche B loans shown on Exhibit C to the Exit Agreement in an aggregate principal amount (without interest, costs or other charges) of in excess of $4,000,000.00.

204. In the alternative to Count II, the Exit Agreement provided for the transfer to Mattson of properties of a value not reasonably equivalent to the value of the properties transferred to Beliveau.

205. On and during the period August 2017 through October 2017, Mattson was engaged in or was about to engage in a business or transaction for which his remaining assets were unreasonably small.

206. Without limiting the foregoing, after the execution of the Exit Agreement Mattson held properties which were insufficient to fund the indemnity obligations he has undertaken, part of the evidence of which is that he defaulted as soon as the prepaid interest reserve expired in ECS loan.

207. Without limiting the foregoing, after the execution of the Exit Agreement, Mattson's cash on hand was insufficient to fund either the indemnity obligations he had undertaken or the cash needs of the major projects he had been allocated – Saco Island (now ROTM Lofts), Elizabeth Seton Hospital rehabilitation, Augusta East Redevelopment Company.

208. On or before the execution of the Exit Agreement and by the execution of the Exit Agreement, Mattson believed or reasonably should have believed that he was incurring debts beyond his ability to pay as they came due. In particular, Mattson believed or reasonably should have believed that he had no ability to pay the Exhibit C debts (private lenders) nor the Tranche B debts as shown on Exhibit C to the Exit Agreement as they came due.

209. In particular, but without limitation, the Exit Agreement which he entered into involved "magical thinking" involving planned goals for which he did not have the resources. *Email K Mattson to S. & C. Beliveau*, 7/14/2018[14].

210. As Mattson described to Beliveau in an email the Exit Agreement was "a good start" but, he still had to "develop my way forward to resolve long term debts like Waterville,

[14] g0agUp8BcmcvLNeRAz0Y

CMCC, Inc. the Gurley's and the remaining Machias Loans. Only then will the exit be truly achieved." *Email K Mattson to S. & C. Beliveau*, 9/4/2017, 11:52:17 a.m.[15]

211. Conor Beliveau did not "have any ideas for the Gurleys" and Mattson responded that "there is no ready source of equity so this is particularly tough." *Email K Mattson to S. & C. Beliveau,* 9/28/2017, 6:41:44 a.m[16]. In a later exchange, Conor Beliveau asked Beliveau and Mattson "Are you guys prepared to level with Drew [Gurley] about where we're really at?" *Email Conor Beliveau to K. Mattson and S. Beliveau*, 4/27/2018, 4:14 p.m. Mattson responded with "Amen. Will be tough but its time." *Email K Mattson to S. & C. Beliveau*, 4/27/2018, 5:27:09 pm.[17]

212. On March 31, 2018, Kevin Mattson again emphasized the inability of the partnership (or himself) to pay the Gurleys:

> At a meeting several months ago with Conor and Severin, it was agreed that at the meeting with the Gurleys we would have a very honest discussion about our ability to pay these notes back (we cant). However we did discuss some long term equity options which would put the Gurleys far "out of the money" but at least give some hope for some capital repayment.

*Email K. Mattson to S & C. Beliveau,* 3/31/2018, 7:44 am.[18]

213. Mattson and Beliveau each knew that the Exit Agreement would cause Mattson to incur debts beyond his ability to pay as they came due.

214. Each of Gurley, the SBA and the IRS, being creditors holding claims in this case, may avoid the transfers from Mattson to Beliveau made in or pursuant to the Exit Agreement. Me. Rev. Stat. tit. 14, § 3578 1. (A)

---

[15] -EagUp8BcmcvLNeRAz0Y
[16] SUagUp8BcmcvLNeRAzwX
[17] ikooZZ8BcmcvLNeR-11u
[18] 00agUp8BcmcvLNeRAz0Y

215. Each of Gurley, the SBA and the IRS, being creditors holding claims in this case, may avoid the obligations incurred by Mattson to Beliveau under the Exit Agreement. Me. Rev. Stat. tit. 14, § 3578 1. (A).

216. *Claims Under 14 M.R.S. §3575 1. (A) - Actual Intent*: The transfers effected (if any, see Count II) by the Exit Agreement were made with the actual intent to hinder delay and defraud one or more creditors. In particular, without limitation, on information and belief, the Exit Agreement was designed to insulate Beliveau from creditors' claims and particularly, the claims of creditors listed in Exhibit C by substituting Mattson (almost judgment proof) for Beliveau (the holder of substantial assets). The purpose of the Exit Agreement was to "minimize Severin's liabilities on the Guaranteed Loans and the Assumed Loans." *Exit Agreement*, p. 1.

217. The Exit Agreement and its transactions have numerous badges of fraud including:

218. The transfers or the obligations were to an insider (Beliveau); Me. Rev. Stat. tit. 14, § 3575 (2)(A).

219. The Debtor retained control of the property transferred in the cases of Newcastle Ventures and Hallowell House. Me. Rev. Stat. tit. 14, § 3575 (2)(B).

220. The transfers and obligations were concealed by the obligation of confidentiality. Me. Rev. Stat. tit. 14, § 3575 (2)(C).

221. The value of the consideration to Mattson was not reasonably equivalent to the property transferred and the obligations incurred. Me. Rev. Stat. tit. 14, § 3575 (2)(H).

222. Mattson was insolvent or became insolvent shortly after the transfers. Me. Rev. Stat. tit. 14, § 3575 (2)(I).

223. At or before the execution of the Exit Agreement, creditors of the Debtor and Beliveau had demanded payment. In particular, debts had been called with "a much great [sic] threat of litigation that threatens [their] entire plan . . ." *Email of K. Mattson to C. Beliveau*, July 3, 2017 2:59:33 p.m.[19]

224. Since then, and evidencing his approach to creditors, Beliveau has been involved in repeated litigation with the unpaid creditors in which he has taken extreme and contentious positions using the cost and delay of litigation to deter creditors from pursuing him for just debts, saying, through his counsel "[b]asically I have every incentive in the world to string this process out for as long as possible, even if I lose at trial and on appeal." *Email R. Creswell to G. Marcus,* 2/27/2020 8:58 am[20].

225. On information and belief, the Exit Agreement was a part of the scheme of Beliveau to extricate himself from payment of just debts to creditors.

226. The Exit Agreement was made with the actual intent to hinder delay or defraud creditors of Mattson and Beliveau from reaching Beliveau's assets.

227. Each of Gurley, the SBA and the IRS, being creditors holding claims in this case, may avoid the transfers effected by or made pursuant to the Exit Agreement under Me. Rev. Stat. tit. 14, § 3578 (1) (A).

---

[19] YEagUp8BcmcvLNeRA0Dt

[20] Atty. Creswell's settlement communication in a different case with a different party is not excluded by Rule 408. "Rule 408 contemplates that the compromise offers and negotiations that would not be admissible relate to the disputed claim between the parties to the action, not a disputed claim between one party to the action and a non-party." United States ex rel. Cleveland Constr., Inc. v. Stellar Grp., Inc., No. 4:16-CV-179(CDL), 2017 U.S. Dist. LEXIS 174600, at *3 (M.D. Ga. Oct. 23, 2017); United States Iron Fla., LLC v. Gma Garnett USA Corp., No. 3:21cv943-TKW-ZCB, 2023 U.S. Dist. LEXIS 60538, at *5 (N.D. Fla. Feb. 21, 2023) ("[n]either the Supreme Court nor [the Eleventh] Circuit has recognized a settlement privilege as a matter of federal common law.") (citations and quotation omitted)

228. *Trustee's Rights Under the Bankruptcy Code*: The Trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C.S. § 544 (b)(1).

229. The Trustee may avoid the transfers of property under the Exit Agreement (if any in light of Count II). 11 U.S.C.S. § 544 (b)(1).

230. The Trustee may avoid the obligations incurred by the debtor to indemnify Beliveau from the Schedule C debts and the Tranche B Debts. 11 U.S.C.S. § 544 (b)(1).

231. Beliveau is the initial transferee.

232. The Trustee is entitled to recover from Beliveau the property transferred or the value thereof. 11 U.S.C. §550(a).

WHEREFORE, the Trustee respectfully requests that this Honorable Court order and decree as follows:

A. That the transfers made pursuant to the Exit Agreement from Mattson to Beliveau (if any in light of Count II) be avoided pursuant to 11 U.S.C. §544(b)(1)

B. That the obligations incurred by Mattson to Beliveau in the Exit Agreement be avoided pursuant to 11 U.S.C. §544 (b)(1);

C. That judgment enter against Beliveau for the value of the assets transferred and the obligations undertaken by Mattson in the Exit Agreement; and

D. For such other and further relief as may be just.

**COUNT VII**
**IN THE ALTERNATIVE TO COUNT II**
**11 U.S.C. 544**
**SECURED PARTY SALE OF**
**NEWCASTLE VENTURES, LLC MEMBERSHIP**

233. Each of the foregoing allegations are hereby realleged and incorporated except that this Count VII is pled in the alternative to Count II.

234. On or before August, 2019, Mattson and Beliveau were all the members of Newcastle Ventures, LLC.

235. On or before August, 2019, Mattson owned 66 2/3 % of the membership interest in Newcastle Ventures, LLC.

236. Beliveau owned the remaining 33 1/3%.

237. The property belonging to Newcastle Ventures, LLC, was real estate in Newcastle Maine known as 52 Main Street.

238. The property belonging to Newcastle Ventures, LLC, had a fair market value as of approximately August 2019 of not less than $1,750,000.

239. The same property was sold by Newcastle Ventures to a third party on June 28, 2024 for $2,050,000.00.

240. The debt secured primarily by the property owned by Newcastle Ventures, LLC, in August 2019, was approximately $961,000.00.

241. The property of Newcastle Ventures, LLC, was also encumbered by mortgages securing obligations of Waterville Redevelopment III, LLC. (the "Waterville Mortgages").

242. The Waterville Mortgages were satisfied in 2021 from sources other than Newcastle Ventures, LLC.

243. The value of the equity of Newcastle Ventures, LLC, as of August 2019, was approximately $788,000.00.

244. The other assets securing the obligations of Waterville Redevelopment III, LLC, made the fair value of the guarantee obligation of Newcastle Ventures, LLC, essentially zero –

meaning that in the process of valuation of the equity in Newcastle Ventures, LLC, the Waterville Mortgages did not reduce the value of the Debtor's equity share.

245. The Debtor's share of Newcastle Ventures, LLC, was worth approximately $525,000.00.

246. Beliveau's share of New Castle Ventures, LLC, was worth approximately $263,000.00.

247. By notice dated August 15, 2019, Defendant Beliveau purported to provide notice of his intent to sell the membership interests of Mattson in Newcastle Ventures, LLC, at a private secured party sale to occur after August 26, 2019. (the "Secured Party Sale")

248. In August 2019, Mattson was insolvent with his assets having a fair value less than his liabilities.

249. In August 2019, Mattson was engaged in a business for which his remaining assets were unreasonably small.

250. In purported execution of the secured party sale, Beliveau sold Mattson's equity interest in Newcastle Ventures, LLC, to Rachel and Alexander Nevens (the "Nevens") pursuant to a Release Bill of Sale and Rent Allocation Agreement (the "Secured Party Sale") each dated August 28, 2019, for the following consideration:

a. A purchase price of $5,000.00

b. The payment of the arrearage on a so-called "Marina Loan" in the amount of $4,377.48;

c. Understandings related to the payment of the "Marina Loan" which understandings having a fair value of not more than approximately $60,000.00.

251. The Secured Party Sale involved no public offering of the collateral.

252. The Secured Party Sale involved no public market check to confirm the valuation used.

253. The understandings related to the payment of the Marina Loan were that Newcastle Ventures would use the rent received each month with respect to the property to pay the first mortgage and then the monthly amount due on the "Marina Loan." The understanding further was that if the "Marina Loan" was paid in full then Beliveau would transfer his interest in Newcastle Ventures, LLC, to the Nevens.

254. In view of the private nature of the sale, the pre-existing relationship between Nevens and Beliveau, Nevens relationship with Mattson, the very low price Nevens paid compared to the value of the asset, Nevens did not receive the transfer in good faith because they were or should have been aware of the voidability of the transaction as a fraudulent transfer.

255. The property was sold in 2024 for $2,050,000.

256. The debt secured by the property at the time of the sale in 2024 was no more than $844,000 as evidenced by the refinanced first mortgage recorded August 3, 2023 at Book 6022, Page 56.

257. The net equity at the time of the sale in 2024 was approximately $1,206,000.00.

258. The Beliveau share of the net equity on sale in 2024 was approximately $402,000.

259. The Beliveau share of the net equity on sale in 2024 was more than sufficient to satisfy the Marina Loan.

260. The Beliveau share of the net equity on sale meant that the Nevens never had to pay anything against the Marina Loan except 2/3's of the monthly payments from the date of the secured party sale (August 28, 2019) to the date of sale – approximately $47,000.00.

261. The total value of the consideration received on the transfer of the Debtor's interest in Newcastle Ventures, LLC, did not exceed $60,000.00.

262. The value of the property transferred by Beliveau's execution of the Secured Party Sale from Mattson to the Nevens was approximately $525,000.00.

263. The Secured Party Sale was not commercially reasonable.

264. The Secured Party Sale violated the requirements of Article 9.

265. The Secured Party Sale by Beliveau was done for the benefit of Beliveau.

266. The Secured Party Sale was within six (6) years of the date of the filing of the petition in this proceeding and was therefore not extinguished as of the petition date (September 12, 2024). Me. Rev. Stat. tit. 14, § 3580 (six (6) year extinguishment)

267. The order for relief entered on October 10, 2024. This action is brought within two (2) of the date of the order for relief. 11 U.S.C. §108(b).

268. *Triggering or "Golden" Creditor.*

269. Joanne Gurley holds an unsecured claim, Claim Number 34, in this case. Gurley held that claim continuously since 2012.

270. Gurley is an unsecured creditor who could avoid transfers made avoidable by Me. Rev. Stat. tit. 14, § 3576.

271. Gurley and every other unsecured creditor in this case could avoid transfers made avoidable by Me. Rev. Stat. tit. 14, § 3575.

272. Pursuant to 11 U.S.C. § 544(b) the Trustee may avoid any transfer avoidable by creditors under either Me. Rev. Stat. tit. 14, §§ 3575 or 3576.

273. *Avoidance under §3576 – Constructive Fraud.*

274. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by the Secured Party Sale was made at a time that Mattson was insolvent.

275. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by the Secured Party Sale was made for less than reasonably equivalent value, the value of the membership interest being transferred being approximately $525,000.00 and the value received in exchange being less than $60,000.00.

276. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by the Secured Party Sale does not benefit from the protection of Me. Rev. Stat. tit. 14, § 3579 (5)(B) because the Secured Party Sale, being commercially unreasonable, did not comply with Article 9-A. Me. Rev. Stat. tit. 11, § 9-1610 (2) ("Every aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable.")

277. Gurley, and therefore the Trustee, may avoid the Secured Party Sale. Me. Rev. Stat. tit. 14, § 3578 (1)(A).

278. *Avoidance under §3575 – Actual Fraud.*

279. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by Secured Party Sale was made as part of a scheme to defraud creditors of Mattson and Beliveau and to divert assets to Beliveau and away from creditors.

280. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by Secured Party Sale was made as part of the scheme detailed in Count VI hereinabove to hinder delay or defraud creditors of the partnership and creditors of Mattson.

281. The transfer of Mattson's membership interest in Newcastle Ventures, LLC, by Secured Party Sale was concealed in that no public disclosure was made of the sale, nor were

attempts made to publicize either its happening nor its conclusion. Me. Rev. Stat. tit. 14, § 3575 (2)(C).

282. The consideration received was not reasonably equivalent to the value of the property transferred. . Me. Rev. Stat. tit. 14, § 3575 (2)(H).

283. At the time of the Secured Party Sale, Mattson was insolvent. . Me. Rev. Stat. tit. 14, § 3575 (2)(I).

284. Badges of fraud exist sufficient to conclude that the Secured Party Sale was actually intended to hinder, delay or defraud creditors.

285. Unsecured Creditors in this proceeding, and therefore the Trustee, may avoid the Secured Party Sale. Me. Rev. Stat. tit. 14, § 3578 (1)(A).

286. Nevens is the initial transferee of the Secured Party Sale.

287. The Trustee is entitled to recover from Nevens the property transferred or the value thereof. 11 U.S.C. §550(a)(1).

288. Beliveau is the entity for whose benefit the Secured Party Sale was made.

289. The Trustee is entitled to recover from Beliveau the value transferred by the Secured Party Bill of Sale. 11 U.S.C. §550(a)(1).

WHEREFORE, the Trustee respectfully requests that this Honorable Court order and decree as follows:

A. That judgment enter against Beliveau in an amount equal to the amount by which value of property conveyed by the Secured Party Bill of Sale was greater than the purchase price;

B. That judgment enter against Nevens in an amount equal to the amount by which value of property conveyed by the Secured Party Bill of Sale was greater than the purchase price; and

C. For such other and further relief as may be just and equitable.

**COUNT VIII**
**IN THE ALTERNATIVE TO COUNT II**
**11 U.S.C. §541**
**VIOLATION OF ARTICLE 9**
**NEWCASTLE VENTURES SECURED PARTY SALE**

290. Each of the foregoing allegations are hereby realleged and incorporated except that this Count VIII is pled in the alternative to Count II.

291. Beliveau violated his duty to conduct the secured party sale of Mattson's membership interest in Newcastle Ventures, LLC, in a commercially reasonable fashion. Me. Rev. Stat. tit. 11, § 9-1610 2.

292. The secured party sale of the Mattson interest in Newcastle Ventures, LLC, was commercially unreasonable because, *inter alia,* the price was inadequate.

293. The secured party sale of the Mattson interest in Newcastle Ventures, LLC, was commercially unreasonable because, *inter alia,* the collateral sold was not exposed to the market.

294. The secured party sale of the Mattson interest in Newcastle Ventures, LLC, was commercially unreasonable because, *inter alia*, the sale of the collateral sold was not publicly advertised.

295. The Mattson membership interest in Newcastle Ventures, LLC, was not disposed of in any recognized market; was not disposed of at a price current in any recognized market at the time of the sale; and was not otherwise in conformity with reasonable commercial practices among dealers in such property.

296. The Debtor was damaged by the failure of Beliveau to meet the requirements of Article 9 in an amount equal to the difference between the value of the collateral sold (approximately $525,000) and the price received (approximately $60,000).

297. The Debtor, and now the Trustee, is entitled to recover from Beliveau the damages suffered from his violation of his obligations under Article 9. Me. Rev. Stat. tit. 11, § 9-1625 (2) ("a person is liable for damages in the amount of any loss caused by a failure to comply with this Article.")

WHEREFORE, the Trustee respectfully requests that this Honorable Court order and decree as follows:

A. That judgment enter against Beliveau in an amount equal to the amount by which value of property conveyed by the Secured Party Bill of Sale was greater than the purchase price; and
B. For such other and further relief as may be just and equitable.

**COUNT IX**
**IN THE ALTERNATIVE TO COUNT II**
**11 U.S.C. §544**
**HARPERS DEVELOPMENT, LLC**

298. Each of the foregoing allegations are hereby realleged and incorporated except that this Count IX is pled in the alternative to Count II.

299. One of the signature early developments of the partnership was the former Digital Equipment manufacturing facility near Augusta. It was acquired from Sanmina-SCI and renamed Central Maine Commerce Center.

300. The ownership entity of the Central Maine Commerce Center was Central Maine Commerce Center, LP.

301. The general partner of Central Maine Commerce Center, LP, was Commerce Center Management, LLC.

302. The members of Commerce Center Management, LLC were: Severin M. Beliveau, John C. Orestis, Spicewood Family Partners, LTD, and the Debtor, Kevin Mattson. Each member owned a ¼ interest in Commerce Center Management, LLC.

303. Harpers Development, LLC, was a Maine Limited Liability Company f/k/a Harpers Construction, LLC, and formed by certificate of formation filed with the Secretary of State for the State of Maine on April 12, 2001.

304. CMCC borrowed $322,020.00 from Harpers Development, LLC, sometime before December 31, 2016.

305. CMCC did not repay Harpers Development, LLC.

306. The members of Harpers Development, LLC, were: Severin M. Beliveau, John C. Orestis, Spicewood Family Partners, LTD, and the Debtor, Kevin Mattson. Each member owned a ¼ interest in Harpers Development, LLC.

307. The Exit Agreement provides for the transfer of various ownership interests between the Debtor and Beliveau.

308. Harpers Development, LLC, filed a certificate of cancellation with the Secretary of State for the State of Maine on May 31, 2018. The certificate of cancellation indicates that it is to be effective as of the date of filing.

309. 6 ECS, LLC, is a Maine limited liability company with an agent and address at Dalameterfarris, LLC, 6 Central Maine Crossing, Gardiner, Maine, 04345.

310. Certain lenders sued Mr. Beliveau and the Debtor in Maine State Court in Ronald Robert Berube, Jr. etal. v. Verus Capital, LLC, et. al., Docket PORSC-CV-2019-00440, and, upon transfer to the Business and Consumer Court, Docket No. BCD-CV-2019-0060.

311. The Debtor and Beliveau and the plaintiffs settled and the plaintiffs assigned their rights in that settlement agreement to 6 ECS, LLC (the "2020 6ECS Settlement").

312. As part of that settlement, on or about October 20, 2020, Beliveau, the Debtor and 6 ECS, LLC entered into an agreement captioned "Transfer of Membership Interest and Debt Agreement." (the "Transfer Agreement").

313. In the Transfer Agreement, the Parties Recited that "the Parties believe that Mattson transferred his 25% membership interest in Harpers Development. LLC ("Harpers Development") to Assignor [Beliveau] (the 'Mattson Interest')."

314. In the Transfer Agreement, the Parties stipulated that the amount due to Harpers Development, LLC, from CMCC was between $322,000 and $500,000.

315. In the Transfer Agreement, the Debtor did not assign any interest in Harpers Development, LLC, held by him but, instead,

> In the event that Mattson continues to hold any interest in the Mattson Interest and/or the Harpers Development Receivable. Mattson shall assign and convey such interests as directed by Assignee [6 ECS, LLC], which assignment and conveyance shall be subject to and in accordance with the terms of this Agreement.

316. The Debtor has not since assigned to any person any interest in the Harpers Development Receivable as defined in the Transfer Agreement.

317. The Debtor has not since assigned or otherwise transferred his membership interest in Harpers Development, LLC to any person.

318. The Debtor had not at any time prior to the execution of the Transfer Agreement assigned, transferred or conveyed to any person the Harpers Development Receivable (as defined in the Transfer Agreement) or his interest in Harpers Development, LLC.

319. In 2021, a form of assignment was prepared to assign the Debtor's interest in the Harpers Development Receivable and in Harpers Development, LLC to Beliveau (the "Draft Assignment").

320. The Draft Assignment valued the Harpers Development Receivable at $700,000.00.

321. Beliveau signed the Draft Assignment.

322. The Debtor did not sign the Draft Assignment.

323. On or about February 14, 2023, CMCC sold substantially all its assets, including the Central Maine Commerce Center to Milton 45 Commerce Drive, LLC, by deed recorded in the Kennebec County Registry of Deeds at Book 14696 pages 262-266.

324. Published reports indicate that the sale price was $18,500,000.00.[21]

325. On information and belief, funds existed from the sale to pay the amounts due to Harpers Development, LLC from CMCC, but no payment was made to Harpers Development, LLC, on account of that debt.

326. As part of the October 31, 2023, Settlement Agreement, the Debtor gave Beliveau a general release of all claims "from the beginning of time to the date of the effectiveness of this Release."

[21] https://mainebiz.biz/article/185m-commercial-transaction-largest-in-recent-augusta-history/

327. The 2023 Settlement Agreement did not assign, transfer or convey the Harpers Receivable nor did it assign transfer or convey any interest of Mattson in Harpers Development, LLC to any person.

328. In 2024 6 ECS, LLC and others sued Beliveau, John Orestis, CMCC and Central Maine Management, LLC, for amounts due under the 2020 6ECS Settlement. (the "2024 ECS Litigation")

329. On or about September 12, 2024, an involuntary petition was filed commencing this bankruptcy case.

330. All Debtor's right title and interest in or to Harpers Development, LLC, any assets of or formerly of Harpers Development, LLC, any proceeds from the Harpers Development Receivable, or any membership interest in Harpers Development, LLC, are property of this Bankruptcy Estate. 11 U.S.C. §541.

331. 6 ECS, LLC amended its complaint on or about March 17, 2025 (the "Amended Complaint")

332. In the Amended Complaint, 6 ECS, LLC, asserts that the Harpers Receivable represents a loan of $300,000 with accruing interest of 10% per annum.

333. The Amended Complaint asserts that the Harpers Receivable had not then been paid.

334. The 2024 ECS Litigation was settled in the second half of calendar year 2025.

335. On information and belief, the 2025 settlement of the 2024 ECS Litigation included the payment of the Debtor's interest in the Harpers Receivable to or for the benefit of Beliveau.

336. No portion of the Harpers Receivable has been paid to the bankruptcy estate of Kevin Mattson.

337. The Debtor's right to recover a portion of the Harpers Receivable is a general intangible.

338. Defendant Beliveau has not perfected his interest in any general intangible by filing an appropriate UCC-1 Financing Statement in the Maine Secretary of State's office.

339. The bankruptcy estate holds the power to avoid transfers avoidable by a hypothetical attaching lien, or judgment creditor as of the date of the petition. 11 U.S.C. §544(a).

340. A hypothetical judgment creditor could perfect an attachment on general intangibles of the Debtor pursuant to Me. Rev. Stat. tit. 14, § 4151 (second paragraph).

341. The hypothetical judgment creditor would take priority over an unperfected security interest the rights to the Harpers Receivable. Me. Rev. Stat. tit. 11, § 9-1317 (1).

342. As described above, Beliveau is the initial transferee of a purported transfer of the Debtor's interest in Harpers Development, LLC, and the Harpers Receivable or the person for whose benefit a transfer was made.

343. The Trustee is entitled to a money judgment equal to value of the rights transferred. 11 U.S.C. §550 (a)(1).

WHEREFORE, the Trustee respectfully requests that this honorable Court order, decree, avoid and declare:

A. That Beliveau's claim to the Harper's Receivable or any payment in connection with it is avoided pursuant to 11 U.S.C. §544(a);

B. That Beliveau's claim to the Harpers Receivable is preserved for the benefit of the estate pursuant to 11 U.S.C. §551;

C. To the extent equitable, that the Court enter judgment against Beliveau as initial transferee equal to the value of any rights transferred pursuant to 11 U.S.C. §550(a)(1); and

D. That Trustee be allowed such other and further relief as may be just and equitable.

**COUNT X – CLAIM DISALLOWANCE**
**11 USC 502(d)**

344. Each of the foregoing allegations are hereby realleged and incorporated.

345. Beliveau filed Claim 30 in this case.

346. Beliveau is a person from whom property is recoverable under 11 U.S.C. §550.

347. Beliveau is the transferee of a transfer avoidable under 11 U.S.C. §544.

348. Beliveau is the transferee of a transfer avoidable under 11 U.S.C. §547.

349. Beliveau is. the transferee of a transfer avoidable under 11 U.S.C. §548.

350. Beliveau has not delivered to the estate the property recoverable under 11 U.S.C. §550 or its value.

351. Beliveau has not delivered to the estate the property the transfer of which is avoidable under 11 U.S.C. §544.

352. Beliveau has not delivered to the estate the property recoverable under 11 U.S.C. §547 or its value.

353. Beliveau has not delivered to the estate the property recoverable under 11 U.S.C. §548 or its value.

354. The Beliveau claim, Claim Number 30, should be disallowed pursuant to 11 U.S.C. §502(d).

WHEREFORE, the Trustee respectfully requests that this honorable Court order, decree, avoid and declare:

A. That Claim Number 30 be disallowed; and

B. That Trustee be allowed such other and further relief as may be just and equitable.

**COUNT XI**
**ALTERNATIVE CLAIM DISALLOWANCE**
**11 USC §502(b)(1)**

355. Each of the foregoing allegations are hereby realleged and incorporated.

356. Judgment (not yet final when the involuntary petition was filed) has entered in a trial court on the allegations that support Claim 30.

357. The not yet final judgment entered by Judge Duddy limits Claim 30 to $288,020.00.

358. The Trial Court considered the arguments proffered by the Beliveaus and rejected them saying the language the parties used was clear and not subject to modification by parol evidence:

> The Court understands Plaintiffs' argument to the contrary, but the Settlement Agreement and Mutual General Release dated October 31, 2023, and the Promissory Note, are clear and unambiguous. Both of those documents call for the standard and well-established present value discounting calculation performed by Defendants. Further, both documents are fully integrated, thereby prohibiting the Court from considering parol or extrinsic evidence.

*Order,* Docketed 9/9/2024, Beliveau et. al. v. Mattson, Business and Consumer Court Docket No. BCD-CV-2023-0031.

359. Judge Duddy was correct and Claim Number 30 if allowed at all should be limited to $288,020.00.

360. This Court is barred from revising or amending Judge Duddy's decision by the Rooker Feldman Doctrine. T.M. v. Univ. of Md. Med. Sys. Corp., No. 25-197, 2026 LX 345671 (June 18, 2026).

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court order and decree:

A. That, if Claim Number 30 is allowed at all, it be limited to $288,020.00; and

B. For such other and further relief as may be just.

Respectfully submitted,
EDMOND J. FORD, TRUSTEE
For the Bankruptcy Estate of Kevin Mattson,
By his attorneys
FORD, McDONALD & BORDEN, P.A.

Date: September 23, 2026

By: */s/ Edmond J. Ford*
Edmond J. Ford, Esq. (Bar No. 010174)
815 Elm Street, Suite 5B
Manchester, NH 03101-2129
(603) 373-1737
eford@fordlaw.com

and

By his attorneys
RIEMER & BRAUNSTEIN, LLP[22]

Date: September 23, 2026

By: */s/ Alan L. Braunstein*
Alan L. Braunstein, Esq. (*Pro hac pending)*
100 Cambridge Street, 22nd Floor
Boston, MA. 02114
(617) 880-3516
ABraunstein@riemerlaw.com

[22] Application to Employ pending.